IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 8, 2026 Session

## IN RE DAISY B.[1]

**Appeal from the Chancery Court for Sumner County**
**No. 23AD-31        Louis W. Oliver, Chancellor**

————————————————————

### No. M2025-00470-COA-R3-PT

————————————————————

Great-Grandmother appeals the denial of her petition to terminate Mother's parental rights. The trial court found one ground for termination but concluded that termination of Mother's parental rights was not in the child's best interest.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed**

JEFFREY USMAN, J., delivered the opinion of the Court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Wende Jane Rutherford, Nashville, Tennessee, for the appellant, Joanna B.

Brandon M. Booten, Gallatin, Tennessee, for the appellee, Sadie M.

## OPINION

### I.

Daisy B. was born in October 2016 to Sadie M. (Mother) and Thomas B. (Father). The family initially resided with the Petitioner, Father's Grandmother, Joanna B. (Great-Grandmother or Petitioner), who is the child's paternal great-grandmother.  During this period, both parents struggled with addiction to illegal drugs and alcohol.

In November 2017, Daisy's younger sibling was born drug-exposed.  The Department of Children's Services received a referral regarding the drug exposure, noting

---

[1] It is the policy of this Court to protect the privacy of children in parental termination cases by avoiding the use of full names.

that Mother tested positive for opiates and marijuana and that Father was incarcerated. Daisy was removed from Mother's custody in December 2017 and placed with Great-Grandmother.

In November 2018, the Juvenile Court for Davidson County adjudicated Daisy dependent and neglected. Mother stipulated to the finding based on her continued drug use and inability to care for Daisy. The court awarded custody to Great-Grandmother and, *inter alia*, granted her discretion over visitation.

Thereafter, Mother was absent from Daisy's life for a period of approximately four years. Mother admitted that she did not see Daisy at all between June 2019 and September 2023 and that she paid no child support during this time. During this period, however, Mother began her recovery from addiction. At trial, Mother testified that she has been sober since October 2020. She successfully completed inpatient rehabilitation in February 2021, followed by a six-month residency at a halfway house, graduating in August 2021.

By the time of trial, Mother had maintained sobriety for over four years. Drug testing was negative for all illegal substances. Mother obtained stable housing in Davidson County and maintained employment with the same company for over three years, earning approximately $3,100 per month. She resided with her partner of seven years, Charles M., who owns and operates drug recovery facilities. Together, they are raising two younger half-siblings of Daisy. The trial court explicitly found that Mother provided a "safe, stable, and secure" home for these children and that they are "thriving" in her care.

On September 26, 2023, about two years after she graduated from the halfway house, Mother contacted Great-Grandmother via text message. The message from Mother stated in part, "I would love to start visiting with Daisy and spending some time with her. Please let me know your thoughts on that. Thanks." Great-Grandmother did not respond to the request. She testified that she did not believe it was appropriate to reintroduce Daisy to Mother after such a long absence.

About two weeks later, on October 12, 2023, Mother filed a *pro se* Petition to Determine or Modify Parenting Time in the Juvenile Court. Great-Grandmother was served with this petition on November 9, 2023. In response to this petition, on December 5, 2023, Great-Grandmother filed the instant Joint Petition for Termination of Parental Rights and Adoption in the Chancery Court of Sumner County. Father joined the petition as a Co-Petitioner, surrendering his rights to facilitate Great-Grandmother's attempt to adopt Daisy. The termination petition alleged five grounds for termination of Mother's parental rights: abandonment by failure to support, abandonment by failure to visit, persistence of conditions, severe child abuse, and failure to manifest an ability and willingness to assume custody.

A bench trial was conducted in January 2025, and the Chancery Court issued its final order in March 2025. The trial court's order provided detailed findings of fact and conclusions of law. The court found that Great-Grandmother proved one ground for termination by clear and convincing evidence: abandonment by failure to support. The court rejected the remaining grounds, finding that Mother had actively sought visitation but that these attempts were thwarted by Great-Grandmother and that Mother had successfully remedied the conditions of addiction and instability. Regarding the failure to manifest ground, the court reasoned that Mother was actively working toward custody, had been drug-free for four years, and posed no risk of substantial harm.

Having determined that a ground for termination was established by clear and convincing evidence, the trial court considered Daisy's best interest, analyzing each of the factors statutorily set forth in Tennessee Code Annotated section 36-1-113. In its best interest analysis, the trial court reviewed the 20 factors and made detailed findings as to each factor. In addition to analyzing the 20 express statutory best interest factors in depth, the court highlighted "unique circumstances" in this case that weighed heavily against termination, and it ultimately ruled that terminating Mother's rights was not in Daisy's best interest.

Primarily, the court expressed concern regarding Daisy's long-term stability with Great-Grandmother. The court noted that Great-Grandmother "is at an advanced age" and "presented no viable lifecare plan for the minor child . . . other than [Great-Grandmother's] testimony that a neighbor of similar age, who is not a relative, would care for the minor child." The court also expressed concern with the "dual standard" apparent in Great-Grandmother's conduct. Specifically, the trial court noted that Great-Grandmother facilitated frequent phone contact between Daisy and her incarcerated Father, who had surrendered his rights. Great-Grandmother expected him to live with her and Daisy upon his release. The trial court, however, had concerns about Father being part of Daisy's life, including his long history of problems with drugs and the lack of a showing that this problem had been addressed. Conversely, Great-Grandmother refused to allow Mother, who had been rehabilitated and sober for years, to have contact with Daisy. Diminishing its potential concern about the reintroduction of Mother into Daisy's life, the trial court noted that because Mother sought visitation rather than custody, Daisy would remain with Great-Grandmother. Additionally, the trial court observed that Mother understood and appreciated the importance of Daisy's relation with Great-Grandmother. The trial court also concluded that Daisy was resilient and "very flexible," finding her to be especially well-adapted for this reintroduction. Accordingly, the trial court determined that preserving Mother's rights would minimally impact Daisy's psychological well-being. The trial court ultimately concluded that the evidence was not clear and convincing that termination of Mother's parental rights was in Daisy's best interest.

Great-Grandmother appeals the trial court's denial of her petition to terminate Mother's parental rights. She raises a challenge both as to the trial court's analysis of the

termination grounds and assessment of Daisy's best interest. She challenges the trial court's rejection of one of the grounds of termination: failure to manifest an ability and willingness to assume custody. She does not challenge the trial court's rejection of three other grounds for termination: (1) abandonment by failure to visit, (2) persistence of conditions, and (3) severe child abuse. Addressing the failure to manifest ground under Tennessee Code Annotated section 36-1-113(g)(14), Great-Grandmother contends that because Mother is effectively a stranger to Daisy, forcing reunification poses a risk of substantial psychological harm.

Great-Grandmother also argues that the trial court erred in its best interest analysis. She contends that the trial court's analysis is reflective of viewing the facts from the parent's perspective rather than the child's, specifically by seemingly prioritizing Mother's recovery over Daisy's need for permanency and by emphasizing Great-Grandmother's "dual standard" differential treatment of Mother and Father. Great-Grandmother asserts the trial court improperly interpreted Daisy's resilience as evidence that she could withstand a change in caretakers, rather than recognizing that resilience as a product of the stability Great-Grandmother has provided for Daisy. Furthermore, Great-Grandmother asserts that Mother demonstrated no sense of urgency, having waited three years after achieving sobriety to initiate contact, resulting in a total absence for six of Daisy's seven years.

Mother concedes that the trial court properly found clear and convincing evidence supported the termination ground of abandonment by failure to support. Responding to Great-Grandmother's contentions, Mother argues in support of the trial court's conclusions. She asserts that the trial court properly found the termination ground of failure to manifest an ability and willingness to assume custody was not established by the clear and convincing evidence. She also asserts that the trial court properly found that clear and convincing evidence does not demonstrate that termination of her parental rights is in the best interest of Daisy.

II.

Parents have a fundamental constitutional interest in the care and custody of their own children. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). This fundamental interest is "far more precious than any property right." *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982)). "[P]ublic policy strongly favors allowing parents to raise their biological or legal children as they see fit, free from unwarranted governmental interference." *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010). However, a parent's rights are not absolute and may be terminated on clear and convincing evidence that statutory grounds for termination exist and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c)(1)-(2); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013).

In a termination of parental rights case, we review a trial court's findings of fact de novo on the record with a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *see* Tenn. R. App. P. 13(d). "In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97). The grounds for termination and the determination that termination is in the child's best interest must be established by clear and convincing evidence, that is, evidence that "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts" and that "eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596; Tenn. Code Ann. § 36-1-113(c). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## III.

We turn first to the matter of statutory grounds for the termination of parental rights. As noted above, Great-Grandmother advanced five grounds for termination of Mother's parental rights before the trial court: abandonment by failure to support, abandonment by failure to visit, persistence of conditions, severe child abuse, and failure to manifest an ability and willingness to assume custody. The trial court determined that only one, abandonment by failure to support, was proven by clear and convincing evidence and rejected the other four grounds. Great-Grandmother raises no challenge to the trial court's rejection of the abandonment by failure to visit, persistence of conditions, and severe child abuse grounds. Accordingly, these grounds are not before us in this appeal.[2] Great-Grandmother argues the trial court erred in finding that she did not establish by clear and convincing evidence the termination ground of failure to manifest an ability and willingness to assume custody. Mother concedes the trial court properly found the termination ground of failure to support to have been proven by clear and convincing evidence. In opposition to Great-Grandmother's position, Mother argues that the trial court

---

[2] Under *In re Carrington*, "in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26. This court has not understood the *In re Carrington* directive to this court regarding considering of termination grounds to apply where the trial court found the ground was not sufficiently proven and that finding has not been challenged on appeal. *In re Disnie P.*, No. E2022-00662-COA-R3-PT, 2023 WL 2396557, at *5 (Tenn Ct. App Mar. 8, 2023) (listing cases). Relatedly, "this rule has never been construed to require this Court to also consider the grounds sustained by the trial court and thereafter conceded or waived by the non-parent on appeal." *In re Zane W.*, No. E2016-02224-COA-R3-PT, 2017 WL 2875924, at *7 (Tenn Ct. App July 6, 2017).

properly determined that clear and convincing evidence does not support the termination ground of failure to manifest an ability and willingness to assume custody.

## A. Abandonment by Failure to Support

We turn first to addressing the trial court's finding that Great-Grandmother presented clear and convincing evidence that Mother abandoned Daisy by failing to support her. Under the applicable statute, abandonment means:

> If the child is four (4) years of age or more, for a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or amended or supplemental petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child. . . .

Tenn. Code Ann. § 36-1-102(1)(A)(i)*(a)* (effective July 1, 2023 to June 30, 2024).[3]

Failure to support is defined as "the failure, for the applicable time period, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant time period." Tenn. Code Ann. § 36-1-102(1)(D). Support must be more than just token support, which is support that "under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B).

Mother did not contest, and in fact endeavors to concede the correctness of the trial court's finding as to this ground on appeal. In accordance with the Tennessee Supreme Court's decision in *In re Carrington H.*, this court, nevertheless, must review the trial court's determination of each termination ground found against a parent. 483 S.W.3d at 525-26. Accordingly, we turn our attention to considering whether this ground was proven by clear and convincing evidence.

The trial court found, and the record establishes, that Mother struggled with active addiction to alcohol and illegal substances from approximately 2016 through October 2020. During this period, Mother was not regularly employed. However, following a claimed sobriety date of October 2020, Mother successfully completed addiction treatment

---

[3] *See In re J.S.*, No. M2022-00142-COA-R3-PT, 2023 WL 139424, at *6 (Tenn. Ct. App. Jan. 10, 2023) ("This court applies the versions of the parental termination statutes in effect on the date the petition was filed.").

in February 2021 and a halfway house program in August 2021. Regarding her financial condition, Mother testified that she had maintained consistent employment since 2021 with the same company and had worked her way up to the position of Key Account Specialist. She also testified that she was earning a gross monthly salary of approximately $3,100 and owned a motor vehicle. Furthermore, the trial court found that Mother's financial burden was mitigated by sharing living expenses with the father of her two younger children, who are Daisy's half-siblings.

Despite her established employment and reduced household expenses, Mother admitted she failed to remit any payments for Daisy between 2021 and when the termination petition was filed. When questioned regarding this failure, Mother testified only that she was focusing on getting her "life back on track." Mother further conceded that she provided no in-kind support prior to the filing of the petition.

Based on the foregoing, the trial court properly found that Mother possessed the financial ability to support Daisy during the two years preceding the petition, and specifically during the relevant four-month statutory period. Despite an ability to provide support, clear and convincing evidence establishes that Mother failed to provide any support in the four months immediately preceding the filing. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i), (1)(D). Accordingly, we conclude the trial court did not err in determining that clear and convincing evidence demonstrated that Mother failed to support Daisy pursuant to Tennessee Code Annotated section 36-1-113(g)(1) (effective July 1, 2023 to June 30, 2024).

### B. Failure to Manifest an Ability and Willingness to Assume Custody

Great-Grandmother argues that the trial court erred in failing to find a second statutory ground for termination of Mother's parental rights, asserting error as to the trial court's conclusion regarding the ground of failure to manifest an ability and willingness to assume custody under Tennessee Code Annotated section 36-1-113(g)(14). Having affirmed the trial court's determination that a statutory ground for termination is supported by clear and convincing evidence, and for reasons discussed below, we pretermit the issue of whether the termination ground of failure to manifest an ability and willingness was proven by clear and convincing evidence.

In accordance with the Tennessee Supreme Court's directive to this court in *In re Carrington H.*, we review every ground for termination found by the trial court. *In re Carrington H.*, 483 S.W.3d at 525-26. This requirement is rooted in protecting the parent's fundamental due process rights. *Id.* at 533-34, 535 (reviewing due process safeguards in termination cases and including the holding "that appellate courts must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests"). As noted by the Tennessee Supreme Court, "requiring this review will ensure that fundamental parental rights are not terminated except upon sufficient proof,

- 7 -

proper findings, and fundamentally fair procedures." *Id*. at 525. In this case, however, it is the Petitioner, Great-Grandmother, who seeks to add an additional ground for termination that the trial court did not find to be supported by clear and convincing evidence.

As this court has previously observed, consistent with the Tennessee Supreme Court's decision in *In re Carrington H.* this court may pretermit consideration of additional grounds for termination that were rejected by the trial court when this court has upheld the trial court's finding of the existence of at least one statutory ground for termination. *See In re Hope G.*, No. E2021-01521-COA-R3-PT, 2022 WL 4391897, at *9 (Tenn. Ct. App. Sept. 23, 2022) ("This ground was not found by the Trial Court or utilized to terminate Father's parental rights. Therefore, we are not required by *In re Carrington H.* to address it."); *see also In re Kylie H.*, No. W2021-00612-COA-R3-PT, 2022 WL 2783906, at *2 n.4 (Tenn. App. July 15, 2022) (pretermitting the petitioner's argument that the trial court erred in declining to terminate parental rights on an additional ground where other grounds were sustained). In *In re Hope G.*, as in the present case, the trial court found that abandonment was proven by clear and convincing evidence but that the petitioners, who were seeking to terminate parental rights, had failed to prove by clear and convincing evidence the second prong of section 36-1-113(g)(14), that the child would be subject to substantial harm. 2022 WL 4391897, at *4. On appeal, the petitioners argued the trial court erred in declining to find the failure to manifest an ability and willingness to assume custody ground had been proven by clear and convincing evidence. *Id.* at *9. Rather than addressing the issue, which had no impact in terms of whether this court would need to consider the best interest analysis, this court concluded that the better course was to pretermit the issue. *Id.* We adhere to the same approach in the present case.

IV.

Having concluded that at least one statutory ground for termination of parental rights has been shown by clear and convincing evidence, our focus shifts to what is in Daisy's best interest. *See In re Audrey S.*, 182 S.W.3d 838, 876-77 (Tenn. Ct. App. 2005). The Tennessee Supreme Court has summarized the law regarding the best interest analysis as follows:

> Facts considered in the best interest analysis must be proven by a preponderance of the evidence, not by clear and convincing evidence. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests. When considering these statutory factors, courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective. Indeed, a focus on the perspective of the child is the common theme evident in all of the statutory factors. When the best interests of the

child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . .

Ascertaining a child's best interests involves more than a rote examination of the statutory factors. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017) (citation modified).

The nonexclusive factors relevant to the best interest analysis are laid out in Tennessee Code Annotated section 36-1-113(i)(1):

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1) (effective July 1, 2023 to June 30, 2024).

The statute makes explicit that the aforementioned statutorily delineated factors are a non-exclusive list, noting that the factors to be considered "may include, but are not limited to" the aforementioned factors. *Id*. Rather than being circumscribed, "[i]n determining whether termination of parental or guardianship rights is in the best interest of the child," the General Assembly has directed that "the court shall consider all relevant and child-centered factors applicable to the particular case before the court." *Id*. The statutorily delineated "list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors." *In re Edward C.*, 684 S.W.3d 410, 424 (Tenn. Ct. App. 2023).

In applying the statutory factors, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2). Ultimately, the determination of a child's best interest "may not be reduced to a simple tallying of the factors for and against termination." *In re Chayson D.*, 720 S.W.3d 123, 146 (Tenn. Ct. App. 2023). "Determining a child's best interest is a fact-sensitive inquiry. . . ." *In re Avery B.*, No. W2016-02542-COA-R3-JV, 2018 WL 2671593, at *10 (Tenn. Ct. App. June 4, 2018). "Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis." *In re I.E.A.*, 511 S.W.3d 507, 518 (Tenn Ct. App 2016) (citing *In re Audrey S.*, 182 S.W.3d at 877). "The relevancy and weight to be given each factor depends on the unique facts of each case." *In re Audrey S.*, 182 S.W.3d at 878. Ultimately, "a court must determine, after completing a holistic assessment of the record, whether terminating a particular parent's rights would be in a particular child's best interest." *In re Mykeena C.*, No. M2024-00206-COA-R3-PT, 2025 WL 2048534, at *13 (Tenn. Ct. App. July 22, 2025).

Here, the trial court made detailed findings as to each of the factors. Great-Grandmother argues that the best interest analysis must remain exclusively focused on the child's best interest, not that of the parent, and contends that the trial court mistakenly considered Mother's best interest instead of the child's best interest. Mother does not dispute that analysis of best interest turns upon the best interest of the child rather than the parent but suggests that it is Great-Grandmother who is advancing her own interests rather

than those of Daisy. It is clear under Tennessee law that "[t]he General Assembly . . . has charged trial courts in parental termination cases with assessing the best interest of the child . . ., not [the parent's] best interest." *In re Bentley W.*, No. E2024-01795-COA-R3-PT, 2025 WL 2959603, at *13 (Tenn. Ct. App. Oct. 21, 2025); Tenn. Code Ann. § 36-1-113(i)(1). The trial court's decision nowhere states an errant standard that is not in accord with this framework; rather, Great-Grandmother's argument is, essentially, that the analysis implicitly reflects an improper consideration of Mother's best interest rather than the child's best interest.

There are aspects of the trial court's assessment of Daisy's best interest as to which we have some concern. Notably, the trial court's emphasis on the fact that Mother was not looking to remove the child from the care of Great-Grandmother but only seeking to begin anew and develop a relationship with the child shaded more of the trial court's analysis of the factors than was appropriate, given that "[w]hen considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2). Additionally, Mother's extended delay in seeking to establish visitation after becoming sober and developing stability in her life weighs more heavily against Mother than the trial court's analysis of best interest appears to recognize.

However, as noted above, to terminate parental rights, the combined weight of all the factors must amount to clear and convincing evidence that termination is in the child's best interests. *In re Gabriella D.*, 531 S.W.3d at 682. Under the unique facts of this case considered as to this child, we simply cannot say the termination of Mother's parental rights is by clear and convincing evidence in Daisy's best interest. This case presents a confluence of unusual circumstances, in large part due to the combination of Great-Grandmother's advanced age, the child still having nearly a decade remaining before reaching the age of majority, and the lack of a viable lifecare plan for the child in the event Great-Grandmother becomes unable to care for her. It is evident from the trial court's findings in this case that these factors were significant to the trial court's determination as to what is in Daisy's best interests. The trial court expressly found that Great-Grandmother "is at an advanced age," which it concluded was especially problematic because Great-Grandmother "presented no viable lifecare plan for the minor child in the event [she] becomes unable to care for the minor." The trial court did note that Great-Grandmother had referenced the prospect of one of her neighbors caring for Daisy, but the trial court observed that the neighbor is "of similar age." The trial court concluded this problem was even further compounded because "there is little family involvement on [Great-Grandmother's] side." This instability was exacerbated by Great-Grandmother's approach to having Father involved in Daisy's life, including plans for his inclusion therein after his release from prison. The trial court plainly had concerns about Father, including his longstanding drug problems, which the court was unconvinced had been meaningfully addressed. The trial court noted Great-Grandmother's divergent approach to Mother and Father reflected decision-making that was not necessarily in Daisy's best interests.

Alternatively, the trial court found that Mother has "conquered her drug problem," is "sober and drug-free," and has maintained stable employment and housing for years. The record supports these findings. The trial court also noted that Mother is successfully raising two other children who are "safe, stable, and secure." The trial court observed that Mother's ability to effectively parent was not merely theoretical or hoped for but instead that Mother had actually demonstrated that she cares well for her two younger children, Daisy's half-siblings. Regarding Mother's home, the trial court observed that there "is ample space and a separate bedroom" that is available for Daisy. The trial court also determined that Mother had demonstrated an ability to meet Daisy's material, educational, housing, and safety needs. Additionally, in contrast to the thinness of family connection with Daisy on paternal Great-Grandmother's side of the family, the trial court also noted that "[t]he child also has a broad network of family on the Mother's side, with whom the minor child has had contact and knows who they are. The Mother's family members include her maternal grandmother, maternal step-grandmother, maternal grandfather[,] and various cousins[] and aunts."

While in a case such as the present one, a matter of significant potential concern is the emotional impact of reintroduction of Mother, a relative stranger, to Daisy, the trial court found that multiple aspects of the circumstances underlying this particular case reduced those concerns. One, the trial court found Daisy to be a resilient and "very flexible" child. The trial court determined that she was especially well-adapted to handle the reintroduction of Mother. Two, the trial court concluded that "Mother recognizes [Great-Grandmother] and the child have a strong relationship and that she would want that relationship to continue." Considering the dynamic, the trial court observed that "[i]t is likely that [Great-Grandmother] will remain as primary caretaker of the child for as long as [she] remains in good health." The trial court also concluded that Mother has an "understanding that her reintegration into the child's life needs to be gradual." Three, while indicating that there was not presently a healthy parental attachment between Daisy and Mother, the trial court expressly determined, given the nature of Daisy and Mother, that "there is a reasonable expectation that a secure and healthy parental attachment can be reforged in this matter between the Mother and the minor child, where one presently does not exist." We cannot conclude that the record preponderates against the trial court's factual findings in relation to this matter.

The clear and convincing evidence standard requires the elimination of "any serious or substantial doubt." *In re Carrington H.*, 483 S.W.3d at 522. Considered in light of the trial court's findings, the applicable standard of review thereof, and the record before us, we are not free of serious or substantial doubt as to whether terminating Mother's parental rights is in Daisy's best interest. Accordingly, while, as noted above, there are aspects of the trial court's analysis upon which we may diverge, we ultimately find no error in the trial court's conclusion that Great-Grandmother failed to prove that terminating Mother's rights is in Daisy's best interest by clear and convincing evidence.

## V.

For the aforementioned reasons, we affirm the judgment of the Chancery Court for Sumner County. Costs of this appeal are taxed to the Appellant, Joanna B., for which execution may issue if necessary. The case is remanded for such further proceedings as may be necessary and consistent with this opinion.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE